Statement of the Case.
MONROE, C. J.
Plaintiff, as trustee in bankruptcy of Robert Babington, Limited, a Louisiana corporation, enjoined the execution of a writ of seizure and sale, sued out by defendant, as holder of a note and mortgage for $10,000, made and executed by the corporation on September 14, 1912; the allegations and prayer of petition for injunction being, in effect, as follows:
That Robert Babington, Limited, was adjudged a bankrupt on February 15, 1915, and that petitioner qualified as trustee on March 13th following; that petitioner is informed and believes that said corporation was insolvent on September 14, 1912; that the note and mortgage sued on were made and executed without consideration, to the knowledge of the parties thereto, and that the officers of the corporation were without authority in the premises; that the mortgage is, in fact, a simulation and a fraud upon the stockhold- [ ers and creditors of said corporation; that, *156 in the alternative, and should the court find that there was a' consideration, it consisted of a pre-existing debt, and that the granting of the mortgage to secure the same was the giving of a fraudulent preference, the corporation having been, at that time, insolvent, to the knowledge of the defendant. He prays for a preliminary injunction and for judgment decreeing its perpetuation and further decreeing said mortgage to be a simulation and a fraud, or, in the alternative, a fraudulent preference, and ordering its cancellation.
Defendant, for answer, challenged the authority of plaintiff to bring the suit, or stand in judgment, but, as that point is not now. insisted upon, it need not be further referred to. On the merits, he alleges that Robert Babington, Limited, and Babington Bros., Limited, were constituted of the same stockholders and managed by the same officers; that Robert Babington, Limited,’ was organized by Babington Bros., Limited, and its capital taken entirely from the assets of its creator, of which it is part and parcel; that the business of the two corporations was so interlocked and interdependent that one could not stand without the other; that the credit of one was the credit of the other, and that the assets of both were used indifferently for the purposes of either; that when he loaned the $10,000, which he is seeking to recover,, he did not know for which of the corporations it was intended, as W. W. Babington, to whom the loan was made, was the manager of both; that the loan was made in 'good faith, and inured to the benefit of Robert Babington, Limited.
It appears from the evidence that the property in controversy was conveyed by Babington Bros., Limited, to ¡Babington-Bateman Company, Limited, in 1905; that defendant loaned the money that he is here seeking to recover out of that property to Babington Bros., Limited, in 1907; that Babington-Bateman Company, Limited, conveyed the property to Robert Babington, in January, 1909; that Robert Babington conveyed it to the Babington Company, which was a partnership composed of himself, his father (W. W. Babington) and his uncle (T. M. Babington), in December, 1909. At what time it was conveyed by the Babington Company to Robert Babington, Limited, does not appear. The mortgage sued on by defendant was executed by the corporation last mentioned on September 14, 1912, but was not recorded until September 23, 1914. The testimony of the defendant concerning the original loan made by him, the giving of the mortgage to secure that loan, and some other matters, reads, in part, as follows:
“Q. When you loaned this money, didn’t you know who was using it, where it was going? A. Loaned it to Willie Babington; he was manager of the business, and- he used it for the business. Q. At that time, did Babington Bros., Limited, have a mercantile establishment also? A. Of course they did. Q. At the time this mortgage was executed to you, just state in your own way * * * exactly what you said, and what W. W. Babington said, in reference to securing • this $10,000. A. He gave me a note, first,, previous to the mortgage note, for $10,000, secured by W. W. Babington and. T. M. Babington, and which he said he estimated they were worth $140,000, and he thought the amount was perfectly secure, and upon that he received my mortgage note (being the note of a third person, held by defendant, from which the money for the loan was to be derived) and cashed it, and it was understood that, any time, he would secure me by mortgage. Q. The note that was given, first, prior to this mortgage, or the one that this mortgage note took up, who owns that note, do you know; have you got that old note? A. T. M. Babington, president of the concern executed the note, and W. W. Babington indorsed it; that is my recollection. * * * Q. The old note, you say, was signed by T. M. Babington and indorsed by W.. W. Babington? A. Xes, sir; T. M. Babington, as president. * * * Q. State whether or not this mortgage was given by Robert Babington, Limited, to you, for the purpose of obtaining an unfair preference over the other creditors; did you have that in view? A. I couldn’t say that; all I know is, they wanted to secure me for my money. Q. At the time this mortgage was executed and the note given to you, state whether or not Mr. Babington, or anybody else, told you concerning the. insolvency and failing condition of the corporation. A. No; if (it) was a fact, it never made no difference to me if (the) concern was *158 insolvent, for I thought the mortgage was perfectly safe for the money.”
It having been shown that there was an understanding at the time the mortgage was executed, that it should not, then, be recorded, defendant was asked the reason for that understanding, and he replied:
“Mr. Babington asked me not to do so, for his own purposes; he didn’t care. (I) had all the trouble in the world to get it executed.”
Being asked whether he knew what the conditions were, among the banks and mercantile corporations of the parish, at that time, he replied:
“Yes, sir; everybody was pushed, but I don’t call that insolvency; I have been in business myself, and been pushed, but I was solvent as ever.”
W. W. Babington states the circumstances under which the mortgage was given as follows:
“Mr. Frieke came to me and told me that we owed him — that Babington Bros. Limited, owed him — and that he was not satisfied. He believed we’d pay him if we could, but conditions were getting such he was not satisfied; he’d like to have some kind of security. I suggested other security, but he said he wanted a mortgage on the drug store building and real estate. I told him I didn’t know if we could give a mortgage on that — it was a different corporation — and that Robert Babington, Limited, didn’t owe him this amount. But, to satisfy him, we decided to give him a mortgage, and it was executed and held over. The reason we didn’t put it on record— our putting as large a mortgage as that amount would precipitate things. He decided not to put it on record, until such time as we’d let him know whether or not we were insolvent; he could put it on then. He was advised to put it on record, which he did. * * * Q. Did Robert Babington, Limited, receive the consideration of the mortgage-money, property or anything of that kind? A. No, sir; nothing at all.”
It is shown that Babington Bros., Limited, dealt in real estate, but co-operated with J. E. Bateman & Co., composed of J. E. Bate-man and E. a. Burris, in establishing Babington-Bateman Company, Limited, for the conduct of a mercantile business; that Babington-Bateman Company, Limited, was succeeded in the mercantile business by Robert Babington; that Robert Babington was succeeded by the “Babington Company,” and the “Babington Company” by Robert Babington, Limited. All of those concerns were controlled by about the same members of the Babington family (though Bateman and Burris appeared to have owned an appreciable minority interest in Babington-Bateman Company, Limited), and the stock and assets of each succeeding concern was paid for, mainly, with the stock and assets of its predecessor. It is a fair inference from the testimony that the real estate and the mercantile businesses, though conducted through the different agencies mentioned, were regarded rather as departments, or branches, of one general business which belonged to, and was conducted by, practically, the same people, and that, when occasion. seemed to require, the assets of the real estate concern were used for the benefit of the mercantile company and those of the mercantile company for the benefit of the real estate concern. Thus W. W. Babington was asked, “Isn’t it a fact that Babington Bros., Limited, loaned Robert Babington Company. 1,000 acres of land, for them to borrow money on, without security?” to which the witness replied, “They had some kind of transaction like that.” And, then, we have the transaction out of which this litigation has arisen, whereby Robert Babington, Limited, mortgaged its property to secure a debt due by Babington Bros., Limited. Nevertheless, Babington Bros., Limited, was always engaged in the real estate business, and, from, say, 1909; Robert Babington, Limited, as the successor of the other concerns that have been mentioned, was engaged, as a distinct juridical entity, in the mercantile business, and each of those corporations incurred its own debts to the people with whom it dealt. It is shown that, in 1912, times were hard in Washington parish, and that the Babington concerns had trouble in paying their bills, and several of the members *160 of those concerns have testified that they did not believe (speaking as of the date when the testimony was given) that they could have realized enough from their assets to pay their debts, and it is evident that defendant felt some uneasiness on that subject; for, whereas, he had loaned his money, without security, in 1907, and h’ad theretofore been contented to allow the transaction to stand in its original shape, he, then, made his demand for security, and the demand was complied -with in order to avert the probable crash which its denial would have precipitated. The effort to sustain the business proved unsuccessful, however, and, in September, ■1913, Robert Babington, Limited, was put in the hands of receivers, and so remained until June 1, 1914, when its affairs were taken in charge by a committee of creditors, who administered until February, 1915, when the corporation was adjudged bankrupt. It may be here remarked that, when defendant was granted the mortgage sued on by him, there was already a mortgage resting upon the property affected by it for an amount about equal to the value of the property, and defendant was given that as another reason why no mortgage that might be granted to. him would be of any value. In the course of the administration by the committee of creditors, however, the bank, which held the first mortgage, threatened to foreclose, and the committee, feeling that such a proceeding would destroy the last hope of pulling the business through, concluded to use the funds which they had succeeded in gathering in paying the bank, and the payment so made left the mortgage to defendant in the front rank. But, as has been stated, the business of Robert Babington, Limited, was not to be pulled through; nor was that of Babington Bros., Limited, for that concern was also put into the hands of a receiver, and had so remained up to the time of the trial in this ease. The liabilities of Robert Babington, Limited, are shown by the testimony of the trustee to be' about $92,000, exclusive of the mortgage claim here asserted by defendant, and tire assets some $10,000, or $12,000, and it appears from the testimony that the relative condition was about the same in 1912.
After this case had been submitted in the trial court, defendant pleaded the “prescription of one year against the alternate plea of plaintiff’s petition, for the reason” (as alleged) “that prescription begins to run from the date of the appointment of receivers of Robert Babington, Limited.” The plea was overruled, and there was judgment, on the merits, for plaintiff, from which defendant has appealed.
Opinion.
[1] The conditions presented in this case are different from 'those in which, after a corporation has incurred debts, the individual members organize another corporation, which takes over the assets of the old and leaves its creditors unpaid. The courts do not tolerate juggling of that kind; but the principle which governs is about the same in both cases, i. e., that the assets of a corporation are-the common pledge of its creditors, and must be first devoted to their payment, before any other disposition can lawfully be made of them. In the ease mentioned, the members of a corporation, burdened with debt, attempt to appropriate its assets to the creation of the capital stock of a new corporation that is free of debt, and the controversy most frequently arises between the creditors, who are thus left unpaid, and the corporation and individuals who have thus attempted to convert and misappropriate the assets which were pledged for their payment. In the instant case, a corporation, burdened with debt, has attempted to make use of its assets for the payment of a debt due by another corporation, composed of the same members; but the controversy has arisen between the creditors of the corporation whose *162 assets — their common pledge — are thus attempted to be misappropriated, and a creditor of the other corporation who is the proposed beneficiary of the misappropriation. The law, however, authorizes the same individuals to establish and conduct the affairs of different corporations, vests each corporation, so established, with the capacity to incur debts, and, in effect, pledges the assets of each corporation for the payment of the debts incurred by it. Whilst, therefore, an individual to whom a corporation has incurred a debt may follow the assets of his debt- or into the hands of another corporation to which they have been illegally transferred, to his prejudice, the principle upon which that right is based operates also to prevent his obtaining the payment of his debt from the assets of the other corporation, and to enable the creditors of such other corporation to prevent its assets from being thus illegally diverted, to their prejudice.
[2] It appears in this case that in 1905, Babington Bros., Limited, alienated the real estate here in controversy, constituting part of its assets, in establishing and acquiring a controlling interest in B'abington-Bateman Co., Limited; that two years later (in 1907) defendant loaned to Babington Bros., Limited, the $10,000 that he is now seeking to recover; that the basis of defendant’s action is a mortgage, which, in 1912, Robert Babington, Limited (successor in title of Babington-Bateman Company, Limited), without consideration, and to the prejudice of its own creditors, imposed upon said real estate, to secure the debt thus contracted to defendant, in 1907, b:?'Babington Bros., Limited.
The “alternative plea of plaintiff’s petition,” to which, alone, and in specific terms, defendant’s plea of prescription is directed, is merely hypothetical, i. e., plaintiff says, if there was any consideration for the mortgage in question (which he denies), it consisted of a pre-existing indebtedness by the mortgagor to defendant, and that the giving of the mortgage to secure the same was the giving of a fraudulent and illegal preference to one creditor over the others, at a time when the common debtor was insolvent. But the evidence fails to show that defendant was ever the creditor of the mortgagor, or that any part of the money loaned by him to Babington Bros., Limited, inured to the benefit of the mortgagor. Hence there was no consideration for the mortgage; and hence, also, there is no question here of giving a preference to one creditor oVer the others, and the plea of prescription is without application.
Upon the merits of the case, defendant has no standing to complain of the alienation, by Babington Bros., Limited, of the property in question, for the law declares that:
“No creditor can, by the [revocatory] action given by this section, sue individually, to annul any contract made before the time his debt accrued.” O. O. 1993.
And. the contract whereby the property was alienated was made before defendant’s debt accrued.
[3] The law further declares that:
“If the contract be purely gratuitous, it shall be presumed to have been made in fraud of creditors, if, at the time of making it, the debtor had not, over and above the amount of his debts, more than twice the amount of property passed by such gratuitous contract.”
The contract here in question is shown to have been purely gratuitous on the part of the mortgagor, and the evidence satisfies us that the mortgagor did not, at the time it was made, have, over and above the amount of its debts, more than twice the amount of the property passed by such gratuitous contract, which must therefore be presumed to have been made in fraud of creditors.
The judgment appealed from is accordingly affirmed.